## IN THE UNITED STATES DISTRICT COURT
## DISCTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Thomas Wilkes, | ) | |
| Barbara Flood, | ) | |
| Vincent Ardizzone, | ) | |
| Gail Litsky, | ) | |
| Carson Mueller, | ) | |
|     On behalf of themselves and | ) | Civil No.: 3:20cv594 |
|     all other persons similarly | ) | |
|     situated, | ) | |
|             Plaintiffs, | ) | |
|     v. | ) | |
| | ) | |
| Ned Lamont, Governor, | ) | |
| Miriam E. Delphin-Rittmon, | ) | |
| Commissioner of DMHAS, | ) | |
| Hal Smith, CEO of | ) | |
| Whiting Forensic Hospital, | ) | |
| Lakisha Hyatt, CEO of | ) | |
| Connecticut Valley Hospital, | ) | |
| State of Connecticut, | ) | |
| Department of Mental Health and | ) | **IMMEDIATE RELIEF SOUGHT** |
| Addiction Services, | ) | |
| Whiting Forensic Hospital, and | ) | |
| Connecticut Valley Hospital, | ) | |
|           Defendants. | ) | April 30, 2020 |

## CLASS ACTION COMPLAINT AND PETITION FOR A WRIT OF HABEAS CORPUS

**Jurisdiction**

1.     This case is brought pursuant to 42 U.S.C. § 1983 to enforce

the constitutional right of all patients at Connecticut Valley Hospital (CVH)

and Whiting Forensic Hospital (WFH), two state inpatient psychiatric

1

facilities, to safe conditions of confinement.  Jurisdiction is based upon 28 U.S.C. §§ 1331 and 1343.  Jurisdiction is also asserted pursuant to 28 U.S.C. 2241 for a writ of habeas corpus.

2.      The Plaintiffs also assert the supplemental jurisdiction of the court for state statutory claims pursuant to the Connecticut Patients' Bill of Rights, General Statutes §§ 17a-540 et seq.  Federal supplemental jurisdiction is asserted pursuant to 28 U.S.C. § 1367.

**Venue**

3.      Venue is based upon 28 U.S.C. § 1392(b)(2) because all of the acts and omissions giving rise to the claims herein arose in the District of Connecticut.

**Parties**

4.      Thomas Wilkes is a 67-year-old honorably discharged Veteran of the Vietnam War who is civilly committed to Connecticut Valley Hospital. Mr. Wilkes currently is confined in CVH - Battell Hall 3 South.  Mr. Wilkes is high risk to contract Covid-19.  He has shown symptoms of Covid-19.  His roommate tested positive for Covid-19.  Mr. Wilkes is a patient as defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(2).

5.      Barbara Flood is a 64-year-old woman civilly committed to Connecticut Valley Hospital.  Ms. Flood is currently confined to CVH -

Woodward Hall 1 North.  Ms. Flood has been discharge-ready for many months but has not been able to secure dialysis treatment in the community.  Ms. Flood has kidney failure and needs weekly dialysis.  Ms. Flood is at extreme high risk for Covid-19.  Ms. Flood is a patient as defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(2).

6.     Vincent Ardizzone is a 58-year-old man who is an acquittee committed to the jurisdiction of the Psychiatric Security Review Board pursuant to General Statutes § 17a-582.  Mr. Ardizzone was committed to Whiting Forensic Hospital on March 4, 1993 for 35 years.  Mr. Ardizzone has been diagnosed with emphysema and Stage IV prostate cancer with metastasis.  Mr. Ardizzone is at very high risk for morbidity and mortality for Covid-19.  Mr. Ardizzone is a patient as defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(2).

7.     Gail Litsky is a 53-year-old woman who is an acquittee committed to the jurisdiction of the Psychiatric Security Review Board pursuant to General Statutes § 17a-582.  Ms. Litsky was committed to the Whiting Forensic Hospital on January 13, 2015 for forty years.  Ms. Litsky is the only female on her unit, Dutcher North 2.  Ms. Litsky has health conditions that put her at high risk for Covid-19.  Ms. Litsky is a patient as

3

defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(2).

8.    Carson Mueller is a 45-year-old man who is an acquittee committed to the jurisdiction of the Psychiatric Security Review Board pursuant to General Statutes § 17a-582.  Mr. Mueller was committed to Whiting Forensic Hospital on September 1, 2009 for sixty years.  Mr. Mueller has been in psychiatric remission for many years, has a full Level 4 with all pass times, and was granted temporary leave by the PSRB.  Mr. Mueller is a patient as defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(2).

9.    Ned Lamont is the Governor of the State of Connecticut.  He is sued in his official capacity only.  Governor Lamont, as the chief executive officer of the state, appoints the Commissioner of DMHAS and has authority to direct the control and operation of all state psychiatric facilities.

10.    Commissioner Miriam E. Delphin-Rittmon is the Commissioner of the Department of Mental Health and Addiction Services with authority to hire the Chief Executive Officers and control and operate all state psychiatric facilities.  The Commissioner is sued in her official capacity for prospective injunctive relief only.

4

11.     Defendant Hal Smith is the Chief Executive Officer of Whiting Forensic Hospital located in Middletown, Connecticut.  Defendant is sued in his official capacity for prospective injunctive relief only.

12.     Defendant Lakisha Hyatt is the Chief Executive Officer of Connecticut Valley Hospital located in Middletown, Connecticut.  Defendant is sued in her official capacity for prospective injunctive relief only.

13.     Defendants State of Connecticut, Department of Mental Health and Addiction Services, Whiting Forensic Hospital and Connecticut Valley Hospital all operate Whiting Forensic Hospital and Connecticut Valley Hospital as facilities as defined in the Connecticut Patients' Bill of Rights, General Statutes § 17a-540(1).  These defendants are sued as facilities under Count 3 for claims pursuant to the Connecticut Patients' Bill of Rights only, and not pursuant to 42 U.S.C. § 1983.  The State has waived sovereign immunity pursuant to the Connecticut Patients' Bill of Rights, § 17a-550.  *Mahoney* v. *Lensink*, 213 Conn. 548, 562 (1990).

**Statement of Facts**

14.     Connecticut Valley Hospital is a state-operated inpatient psychiatric facility with three residential hall buildings; Battell Hall, Woodward Hall and Merritt Hall.  The total patients at CVH in the general psychiatry division is approximately 209.

5

15.    The legal status of almost all patients at Connecticut Valley Hospital is committed pursuant to General Statutes § 17a-498(c) or voluntary status pursuant to General Statutes § 17a-506.

16.    Battell Hall has six units that have an approximate census of 15 to 20 patients each; B2N, B2S, B3N, B3S, B4N and B4S.  This building is designated as a general psychiatric building with both men and women patients.  B2S, B3S and B4S have been quarantined at times and have isolated patients who have tested positive for Covid-19.

17.    CVH units are small units with sleeping rooms, a day room, a TV room, a comfort room, a restraint and seclusion room and rooms for staff.  It is impossible for the patients to maintain at least six feet from other patients.  No, or almost no, patients have a single room.  Most patients sleep in open dorms with nothing but temporary walls that do not reach the ceiling.

18.    Woodward Hall has four units that have an approximate census of 15 to 20 patients each; WW1S, WW1N, WW2S, and WW2N.  Woodward two south is designated as a traumatic brain injury unit.  The other units are general psychiatry patients treating both men and women.  Woodward Hall generally treats older patients over 50 and patients with significant general medical needs.

19.     The units in Woodward have sleeping rooms, a day room, a TV room, restraint and seclusion rooms, and rooms for staff.  Most patients sleep two to a room.  A few patients have a single room.  Woodward does not have open dorm-like sleeping rooms.  Patients at Woodward tend to be older and more frail with general health needs.

20.     On April 29, 2020, the last two elderly patients on Woodward 2 North were transferred off the unit.  All of the other patients on that unit had tested positive for Covid-19 and were transferred to Middlesex Hospital for respiratory treatment, including ventilator treatment, or to the CVH GPD quarantine unit in Merritt Hall, M3D-E.  Almost all of the nurses and MHA staff on WW2N were off work after testing positive for the coronavirus.

21.     Merritt Hall 4D is a general psychiatric unit that is designated as the young adult services unit for patients age 18 to 25.  The Young Adult Unit has 17 beds.

22.     Merritt Hall 3D-E has been designated as the isolation unit for the general psychiatry division for patients who test positive for Covid-19.

23.     Whiting Forensic Hospital holds patients with a legal status of civil commitment, civil-voluntary, acquittees committed to the jurisdiction of the Psychiatric Security Review Board (PSRB), competency restoration,

Department of Corrections transfers, and forensic patients for forensic evaluations.

24.    Whiting Forensic Hospital has two buildings for patients. Maximum Security Service is generally referred to as Whiting Max. Enhanced Security Service is in the Dutcher building and contains units where patients expect to be transitioned to the community and eventually discharged.

25.    Whiting Maximum Service contains six units, five of which are fully staffed.  Units 1, 2 and 3 are primarily competency restoration units and hold approximately 20 patients each.  These three units accept patients upon order of the Superior Court pursuant to General Statutes § 54-56d.  Patients receive psychiatric treatment and competency restoration education and evaluation.  Patients may be held for the maximum possible sentence for their charges or for 18 months, whichever is less.  General Statutes § 54-56d(i).

26.    WFH Units 4 and 6 are longer term treatment units and hold a mix of patients, most of whom are acquittees committed to the jurisdiction of the PSRB.   Units 4 and 6 generally hold approximately 20 patients.  Unit 5 has only one patient and operates as an adjunct of Unit 4.  Whiting Max has a total capacity of 91.

27.    Patients residing on Whiting Forensic Hospital Units 4 and 6 have various legal statuses.  A majority are acquittees committed to the jurisdiction of the Psychiatric Security Review Board pursuant to General Statutes § 17a-582.  A minority of the patients are civilly committed pursuant to General Statutes § 17a-498(c), Department of Corrections transfers committed pursuant to General Statutes §§ 17a-512 to 17a-520, civilly committed by a Physician's Emergency Certificate pursuant to General Statutes § 17a-502, or post-conviction examinations pursuant to General Statutes § 17a-566a.

28.    Dutcher Enhanced Security Service generally serves patients who are admitted to Whiting Forensic Hospital but do not require maximum security service.  Dutcher has a competency restoration unit and five treatment units.  The vast majority of the patients on the treatment units started in WFH max and transferred to Dutcher for ongoing treatment and transition to temporary leaves, conditional discharge or community integration.  Dutcher has 138 beds.

29.    At both CVH and WFH, all of the units are staffed with three shifts of staff.  On the first shift, 7 a.m. to 3 p.m., professional staff of psychiatrist, psychologist, unit director, social worker, nurses, and rehabilitation staff work along with Forensic Treatment Specialists

(FTS)(WFH) or Mental Health Associates (MHA)(Dutcher).  Total staff on each unit for each shift depends on the needs of the patients and their observation level.  Some patients may be on regular observation while others may need two to one observation.

30.     Many FTS's and MHA's may be mandated, which means they are required to work overtime or a double shift if necessary to provide minimum staffing for a unit.  This may necessitate a staff member to work on two different units in one day.

31.     On March 24, 2020, DMHAS announced that the first staff at CVH had tested positive for Covid-19.  The staff reported out sick on March 11, 2020, was tested on March 14, 2020 and notified DMHAS on March 23, 2020 that he or she was positive for Covid-19.  Patients and staff in contact with the employee were quarantined.

32.     On March 26, 2020, DMHAS reported that the first patient at CVH tested positive for Covid-19.

33.     The DMHAS Commissioner stated that she was taking significant steps to protect clients and staff from Covid-19.  Those steps included:

a) Adjusting outpatient services while promoting social distancing including telephone check-ins and closing wellness centers and social clubs.

b) Restricting visitors from DMHAS facilities.

c) Conducting health screenings of all individuals who enter DMHAS facilities, including staff and clients.

d) Approving over 900 employees for telework to promote social distancing and minimize exposure to clients and staff at DMHAS facilities.

e) Directing staff who are symptomatic or have been in close contact with individuals suspected of or having Covid-19. to stay home and self-quarantine to prevent infecting clients and other staff.

34.    Neither the Commissioner nor any other defendant took steps to test all patients and staff to determine the scope of the infection in the hospitals, nor provide masks, nor ensure social distancing, nor take steps to decompress the units by discharging, granting temporary leave, conditional discharge or providing temporary shelters or tents.

35.    By March 31, 2020, five patients at CVH, five patients at WFH and two staff at CVH had tested positive for Covid-19.  Probably two to five times more than those tested were infected.

36.     On April 10, 2020, DMHAS and WFH, issued an isolation and quarantine protocol for inpatient psychiatric facilities.  On April 13, 2020, WFH updated its isolation and quarantine protocol.  On April 16, 2020, DMHAS updated its isolation and quarantine protocol for psychiatric facilities.

37.     On April 21, 2020, DMHAS reported that 22 patients at CVH, 13 staff at CVH, 7 patients at WFH, and 13 staff at WFH tested positive for Covid-19.

38.     As of April 28, 2020, patients and staff with confirmed Covid-19, are in every building in CVH and WFH.  Numerous patients are so ill that they have had to be transferred to Middlesex Hospital for acute respiratory care.

39.     On April 30, 2020 CVH had a patient die from Covid-19.

40.     Almost all patients on every unit in both CVH and WFH live in close contact with 15-20 other patients and 5-10 staff at any one time.  All patients share two phones on each unit.  Almost all patients share one bathroom with all the other patients.  A few units, WFH U1, DS3 and several units in CVH are coed units and patients share bathrooms with half the unit comprised of persons of similar gender or gender-identified. Patients eat together as a unit either in the dining room or on the unit.

Social distancing is not consistently possible on an inpatient unit at CVH and WFH.

41.     On March 10, 2020, the Governor declared a public health and civil preparedness emergency pursuant to General Statutes § 19a-131a and § 28-9, such emergency to be in effect through September 9, 2020.

42.     From March 12, 2020 through April 24, 2020, the Governor has issued 32 executive orders aimed at limiting the spread of the Coronavirus, infection of the public, and deaths from Covid-19.

43.     Only one of the Governor's executive orders has addressed the dire danger of the Coronavirus to patients in state psychiatric facilities. Executive Order 7C, issued on March 15, 2020, suspended the Connecticut Patients' Bill of Rights, General Statutes § 17a-547 and authorized the Commissioners of DPH and DMHAS to issue any and all orders restricting entrance into the facilities they deem necessary to protect the health and welfare of the patients, residents and staff.  Executive Order 7C also waived the patients' right to confidentiality in General Statutes, § 52-146f, allowing the Commissioner of DPH and local health directors to report cases of Covid-19 from psychiatric facilities.

44.     The only other executive orders affecting patients in state psychiatric facilities are Executive Order 7F which waives patients' rights to

13

personal service of process and to the right to appear in person for any

probate court hearing and Executive Order 7K which waives all time

requirements of any kind for notice, service of process or to hold a hearing,

even if the patient is held against their will in a state psychiatric hospital.

Several patients have been quarantined on their CVH or WFH inpatient unit

and have not been allowed to attend their probate hearing and the hearing

has been held without their appearance either in person, on video or on the

phone.

45.    While there have been several executive orders waiving and

suspending the constitutional and statutory procedural due process rights

of psychiatric inpatients, no executive order has been issued directly to

protect the health and welfare of confined patients from the risk of infection

and death from Covid-19 by ordering testing of all patients and staff, social

distancing of all patients, ordering masks, review of all patients for

discharge, temporary leave, conditional discharge or transfer to temporary

alternate housing.

46.    On April 18, 2020, the Executive Director of the Connecticut

Legal Rights Project wrote a letter to the Governor and the Attorney

General requesting an executive order:

   a) To immediately stop all new admissions to all state-operated
      psychiatric facilities;

b) require that every facility review the present mental status of each patient;

c) require that each facility make every effort to discharge every patient who does not absolutely need inpatient hospital level of care; and

d) require that each facility make every effort to discharge every patient for whom the risks of inpatient psychiatric care in the face of the Covid-19 pandemic outweigh the benefits of that level of care when such discharge does not pose an unreasonable risk to the public.

47.    On April 18, 2020, CLRP requested that the Governor act immediately due to the imminent and substantial risk that patients and staff would become gravely ill and many may die.

48.    On April 29, 2020, CLRP was informed by staff at CVH that administrators at CVH were closing an entire ward, Woodward 2 North, because all but two patients were ill or symptomatic with Covid-19 and had been transferred to Middlesex Hospital and on ventilators or transferred to the CVH quarantine unit in Merritt Hall, M3D-E.  On April 30, 2020, the first patient from CVH died of Covid-19.

49.    Defendants have failed to plan for an infection outbreak in the hospitals.  Such failure resulted in or substantially contributed to Covid-19. infections and outbreaks in staff and patients.

50.    Defendants have failed to provide and ensure social distancing of patients.  Such failure resulted in or substantially contributed to Covid-19 infections and outbreaks in staff and patients.

51.    Defendants have failed adequately and timely to test staff and patients for Covid-19 in order to measure the outbreak in February, March and up through the present.  Such failure resulted in or substantially contributed to Covid-19 infections and outbreaks in staff and patients.

52.    Defendants have failed adequately and timely to provide masks and personal protective equipment to patients and staff.  Such failure resulted in or substantially contributed to Covid-19 infections and outbreaks in staff and patients.

53.    Defendants have failed adequately and timely to isolate and quarantine patients and staff.  Such failure resulted in or substantially contributed to Covid-19 infections and outbreaks in staff and patients.

54.    Defendants acts and omissions were deliberately indifferent or done with reckless disregard and have resulted in unsafe conditions of confinement.

**Class Action Factual Allegations**

55.    The named Plaintiffs bring this suit on their own behalf and on the behalf of all current CVH and WFH patients and all patients who will be admitted in the future during the Covid-19 pandemic.

56.    This class is so numerous that joinder of all members is impractical.  CVH and WFH currently have a census of approximately 438 patients, all of whom are similarly situated and in danger of infection, illness and death from Covid-19.  Because patients are discharged and continue to be committed to both facilities the class includes all those future patients who are admitted but whose identities are not known at this time.

57.    There are questions of law and fact common to all class members, including but not limited to Defendants' deprivation of the class members' substantive due process rights, the Defendants' failure to provide constitutionally safe and humane conditions of confinement, Defendants' failure to ensure that Plaintiffs are treated in the most integrated setting, and Defendants' violation of the Plaintiffs' rights under the Connecticut Patients' Bill of Rights to adequate treatment and protection of their constitutional rights.

58.    The named Plaintiffs will fairly and adequately represent the interests of the class.  The Plaintiffs, as patients at WFH and CVH, possess

17

strong personal interest in the subject matter of the lawsuit and are represented by counsel with experience in class action litigation. Counsel have the legal knowledge and resources to fairly and adequately represent the interests of all class members in this action.

59.    Defendants have acted or refused to act on grounds generally applicable to the class in that Defendants' policies and practices of violating the Plaintiffs' constitutional and statutory rights have affected all class members. Accordingly, final injunctive and declaratory relief is appropriate to the class as a whole.

**Necessity for Emergency Injunctive Relief**

60.    The Defendants have acted, failed to act, and continue to act and fail to act, in violation of the law including their duty to provide safe conditions of confinement. The named Plaintiffs and the class they seek to represent do not have an adequate remedy at law. As a result of the policies, practices, acts, and omissions of the Defendants, the named Plaintiffs and the class they seek to represent, have suffered, are suffering, and will continue to suffer, serious, imminent, irreparable physical, mental, and emotional injuries as a result of the outbreak of Covid-19 in both hospitals. Such serious injuries are continuing, likely irreversible, and in some cases, fatal.

18

**Count 1: Violation of Patients' Fourteenth Amendment Right to Safe Conditions of Confinement.  Official capacity claims only against the Governor, Commissioner and CEO's of WFH and CVH.**

61.    Plaintiffs incorporate by reference paragraphs 1 – 60 into this count.

62.    The Due Process Clause of the Fourteenth Amendment provides that "no State shall deprive any person of life, liberty, or property without due process of law."

63.    The substantive component of the of the Fourteenth Amendment's Due Process Clause requires the State to provide involuntarily committed patients with mental health conditions with such services as are necessary to ensure their reasonable safety from themselves and others.  *Youngberg v. Romeo*, 457 U.S. 307, 314-325 (1982).

64.    The Due Process Clause of the Fourteenth Amendment obligates the State to provide patients in its psychiatric hospitals with adequate food, shelter, clothing, medical care and safe conditions of confinement.  *Youngberg v. Romeo*, 457 U.S. 307, 315-316 (1982).

65.    The affirmative duty to protect the Plaintiffs and the Plaintiff Class arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help them, but from the limitation which it

19

has imposed on his and her freedom to act on her or his own behalf.

*DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189,

200 (1989).

66.    Defendants' acts and omissions were under color of state law.

67.    Defendants' acts and omissions were done with deliberate

indifference and reckless disregard for the patients' right to safe conditions

of confinement.

68.    Defendants' acts and omissions caused or substantially

contributed to unsafe conditions of confinement for patients at WFH and

CVH and resulted in numerous infections with Covid-19, physical and

mental suffering of patients already dealing with mental health conditions,

and risk of death from infection with the Coronavirus.

69.    Defendants' policies, practices, acts and omissions have placed

and will continue to place the named Plaintiffs and the members of the

class they seek to represent at an unreasonable risk of harm.

70.    Plaintiffs are entitled to immediate injunctive relief and/or a writ

of habeas corpus to relieve them from unconstitutionally unsafe conditions

of confinement at CVH and WFH.

**Count 2 – Title II of the Americans with Disabilities Act**

71.     Plaintiffs incorporate by reference paragraphs 1 – 60 into this count.

72.     The named Plaintiffs and the Plaintiff Class are qualified individuals with disabilities within the meaning of the Americans with Disabilities Act.  The Plaintiffs and the Plaintiff Class have one or more physical or mental impairments that substantially limit one or more major life activities including caring for oneself, concentrating and thinking.

73.     Plaintiffs and the Plaintiff Class have all been determined by the defendants to need inpatient psychiatric hospital level of care, which includes psychiatric treatment, nursing care and 24/7 supervision.

74.     The State of Connecticut and its Department of Mental Health and Addiction Services is a public entity as defined in Title II of the ADA.

75.     Defendants do not have sovereign immunity for claims pursuant to Title II of the ADA because of the long history of discrimination against people with disabilities by the State and for the failure to ensure safe conditions of confinement as required by the Due Process Clause of the Fourteenth Amendment.  *Lane v. Tennessee*, 541 U.S. 509 (2004).

76.     Defendants State of Connecticut and DMHAS have discriminated against Plaintiffs and the Plaintiff Class by repeatedly failing

21

to reasonably modify its system to reduce the segregation of Plaintiffs with disabilities from their communities of non-disabled peers during emergencies that threaten the physical and mental health and safety of the Plaintiffs and undermine the clinical justification for such confinement.

77.     Defendant State of Connecticut's and DMHAS's discrimination includes the failure to take reasonable steps such as ceasing admissions, ceasing involuntary civil commitments, assessing all patients to balance the necessity of their commitment against the risk of infection, illness and death from Covid-19, planning for discharge, temporary leaves, conditional release and providing safe permanent or temporary housing accommodations to decompress the density on each inpatient psychiatric unit.

**Count 3 – Connecticut Patients' Bill of Rights**

78.     Plaintiffs incorporate by reference paragraphs 1 – 60 into this count.

79.     Defendants WFH and CVH are facilities as defined in General Statutes § 17a-540(1).

80.     Plaintiffs and Plaintiff Class are patients as defined in General Statutes § 17a-540(2).

81.     Defendants failed to provide safe conditions of confinement in violation of General Statutes § 17a-541.

82.     Defendants failed to provide humane and dignified treatment in violation of General Statutes § 17a-542.

83.     Defendants failed to provide for an adequate discharge plan and discharge planning once they knew or should have known that Covid-19 was rampant in the facilities and posed an imminent risk of infection, illness and death to the patients in violation of General Statutes § 17a-542.

**Prayer for Relief**

1.  Take jurisdiction of this matter.

2.  Certify this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2).

3.  Declare that the Defendants violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment.

4.  Declare that Defendants violated Plaintiffs' rights under the Americans with Disabilities Act.

5.  Declare that Defendants violated Plaintiffs' rights under the Connecticut Patients' Bill of Rights.

6.  Enter injunctive relief and/or a writ of habeas corpus requiring

    Defendants to:

    a.  Issue an Executive Order suspending all commitments for civil

        patients, competency restoration patients, DOC transfers and

        acquittees to the jurisdiction of the PSRB.

    b.  Issue a writ of habeas corpus ordering Defendants to assess

        every patient in WFH and CVH and release a sufficient number

        of patients to enable the remaining patients to practice safe

        social distancing and to enable the staff to maintain the hospital

        in constitutionally safe conditions of confinement.

    c.  Immediately take all actions within their power to discharge,

        grant temporary leaves, grant conditional discharge or order

        placement in the most integrated setting.

    d.  Order that all necessary residential and community supports

        and services and treatment be provided in the most integrated

        setting in the community.

    e.  Within 48 hours, conduct individual assessments of every

        patient in WFH and CVH with participation of the patient, their

        legal representative and a person of their choice to assess

        whether the person is within the CDC and/or DMHAS category

of high risk to remain on an inpatient psychiatric unit and to get the informed consent of the patient to discharge them to the most integrated setting.

f.  Appoint an independent court monitor to enforce the Court's orders.

g.  Grant the Plaintiffs other relief as the Court deems just.

h.  For the remaining patients, order that every patient and all staff be tested and regularly retested so that patients, staff and administrators no the nature and extent of the virus on each unit, building and hospital.

i.  For the remaining patients after decompression of the units, order patients be protected with adequate social distancing, including each patient have their own room.

j.  Order that bathrooms, rooms, phones and units be cleaned and disinfected at least once every shift.

k.  Order that staff have adequate personal protective equipment as required by the CDC guidelines for hospitals and order that patients be given masks and gloves upon request.

Respectfully submitted,

s/Kirk W. Lowry (#ct 27850)
Legal Director
Connecticut Legal Rights Project
CVH – Beers Hall 2nd Floor
P.O. Box 351 – Silver Street
Middletown, CT 06457
(860) 262-5017
Fax (860) 262-5035
klowry@clrp.org